Filed 6/16/16  In re M.H. CA4/2

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION TWO

| | |
|---|---|
| In re M.H., a Person Coming Under the Juvenile Court Law. | |
| SAN BERNARDINO COUNTY CHILDREN AND FAMILY SERVICES, | E065016 |
| Plaintiff and Respondent, | (Super.Ct.No. J252655) |
| v. | OPINION |
| B.F., | |
| Defendant and Appellant. | |

APPEAL from the Superior Court of San Bernardino County.  Lynn M. Poncin, Judge.  Reversed with directions.

Jasmine J. Turner-Bond, under appointment by the Court of Appeal, for Defendant and Appellant.

Jean-Rene Basle, County Counsel, and Danielle E. Wuchenich, Deputy County Counsel, for Plaintiff and Respondent.

1

B.F., the mother of M., appeals an order terminating parental rights. The child's father, K.H. (father), is a not a party to the appeal.[1] Mother contends that the court erred by failing to apply the beneficial parent-child relationship exception to the statutory preference for adoption as the child's permanent plan; that it failed to make sufficient inquiry into M.'s possible status as an Indian child, as defined in the Indian Child Welfare Act of 1978, or ICWA (25 U.S.C. § 1901 et seq.); and that adequate notice was not provided to the pertinent tribes or authorities as required by ICWA.

We conclude that the court failed to comply with the ICWA inquiry and notice requirements, and we will conditionally reverse the judgment for the limited purpose of complying with ICWA.

## FACTUAL AND PROCEDURAL HISTORY[2]

M. was detained at the age of three months, when his parents were arrested for possession of methamphetamine. Mother's sister had filed a missing person report after mother told her that father had threatened to kill her and the baby. The sheriff's department found the family in a motel in Victorville. Mother had bruises, but denied any domestic violence. Both parents were on felony probation. A probation search showed that both mother and father had methamphetamine on them and that there was

---

[1] Mother was married to another man when M. was born. However, father stated that he was present at M.'s birth, that his name was on the birth certificate, that he had signed a voluntary declaration of paternity, and had held the child out to be his own. The court ultimately found father to be the presumed father.

[2] Because of the limited issues raised in this appeal, a relatively brief history suffices.

methamphetamine inside the motel room. M. appeared to be "reasonably alert and healthy, not malnourished," and the drugs were not within his reach.

The San Bernardino County Children and Family Services (CFS) filed a petition pursuant to Welfare and Institutions Code section 300,[3] alleging that mother and father had failed to protect M., in that they both had a substance abuse problems that interfered with their ability to provide adequate and appropriate care, supervision and provisions for the child, and placed him at risk of harm and/or neglect. It also alleged that the parents engaged in domestic violence in M.'s presence, putting him at risk for harm and/or neglect. (§ 300, subd, (b).) The petition also alleged that the parents were incarcerated and failed to provide for M. (§ 300, subd. (g).)

At the detention hearing on January 7, 2014, mother was present but father was not. The court ordered M. detained in a foster home and ordered visitation and drug testing for mother. Mother denied any Indian heritage, but informed the court that father did have Indian heritage. At a second detention hearing on January 9, 2014, which father did attend, the court ordered visitation for father as well. Father stated that he had Indian ancestry on his father's side of the family, but that he did not have any other information. He stated that he was going to research the matter and would obtain information from his mother. He gave his mother's name and date of birth and stated that she worked for the

---

[3] All statutory citations refer to the Welfare and Institutions Code.

state department in Washington, D.C. The court ordered him to complete form ICWA-020 (parental notification of Indian status) and to provide any additional information as quickly as possible.

After the parents were released from custody, a first amended petition was filed. It eliminated the section 300, subdivision (g), and domestic violence allegations, and added an allegation that the parents had failed to provide a safe home, in that the parents used drugs in the home, drug paraphernalia was present in the home, and that the condition of the home posed a health and safety hazard. (§ 300, subd. (b).)

On January 13, 2014, father filed his form ICWA-020, stating that he had or might have Indian ancestry and was or might be a member of or eligible for membership in a federally recognized Indian tribe. He stated that his Indian ancestry was through his paternal grandmother. He stated that he did not know what tribe he might be affiliated with.[4]

At the uncontested jurisdiction and disposition hearing on February 20, 2014, the court found that M. came within section 300, subdivision (b). The court ordered him removed from the parents' custody and placed in a foster home, and ordered reunification services and supervised visitation for both parents. The court granted father's motion for presumed father status.

---

[4] We discuss father's assertion of possible Indian ancestry in more detail in the legal analysis section, below.

4

At the six-month status review hearing on August 20, 2014, the court found that mother was "doing well" in her reunification plan and had made substantial progress in alleviating the causes which necessitated placement, but that father had not participated in any services and had made only minimal progress. Mother offered to provide evidence that she was no longer residing with father. Both parents visited regularly and visitation was going well, although mother could not progress to unsupervised overnight visits as long as father remained in the home. The court ordered both parents to participate in their reunification plans and ordered continued supervised visitation for both parents. The court authorized CFS to facilitate unsupervised visits for mother "when appropriate," but informed mother that no unauthorized individual, including father, could be present during unsupervised visits. The court further informed mother that if M. could not be returned to her care by the 12-month status review hearing, parental rights might be terminated.

By the 12-month status review hearing on February 19, 2015, CFS recommended terminating reunification services. Despite having been ordered to participate in services, father had not begun doing so until December 2014 or January 2015. Mother, despite her earlier progress in her reunification plan, had lapsed. She did not attend a scheduled intake meeting in August 2014 for the general counseling ordered by the court, and did not request a new referral until January 2015. She was terminated from her substance abuse program because she did not comply with aftercare attendance requirements. When asked why she did not comply, she said she had been ill. When asked for a doctor's verification, mother submitted a form showing a visit to an emergency room

5

with portions of it, including the date, obliterated. She also failed to take ordered random drug tests on three dates; however, all of the tests she had taken were negative. She was told when she was discharged from the aftercare program that she was required to attend at least three "NA/AA meetings per week" and submit attendance sheets. She did not do so. Moreover, although she reported that she was no longer living with father, she had not provided any evidence of that. In light of those facts, CFS believed that returning M. to the parents would create a substantial risk of detriment to his physical and/or emotional well-being.

After a contested hearing, the court found that the parents' progress had been minimal and that despite the evidence presented at the hearing that both parents were participating in reunification services, there was not a substantial probability that M. could be returned to the parents within the statutory time limits. It terminated reunification services and set a permanency hearing pursuant to section 366.26.

At the section 366.26 hearing calendared for June 18, 2015, CFS informed the court that M. was adoptable and that the foster parents with whom he had lived since the inception of the dependency wanted to adopt him. However, paternal relatives in Maryland had also expressed an interest in adopting M., and the Interstate Compact for Placement of Children (ICPC) process for assessing their suitability had not been completed. CFS requested a continuance of 120 days; the court granted it. On October 16, 2015, the hearing was continued again to allow authorities in Maryland to complete the ICPC process.

At the continued hearing on December 14, 2015, father presented no evidence, but argued that the relatives in Maryland should still be considered as a placement for M., even though the ICPC process had still not been completed. Mother testified about the quality of her visits with M., which had continued throughout the dependency. She described his happy response when he would see her and the activities they engaged in. She testified that in addition to reading to him and playing with him, she fed him lunch, assisted with his toilet training and disciplined him with time-outs as necessary. She acknowledged that she had never progressed to unsupervised visits. M. called her "momma" and called his foster mother "mommy." She testified that at the end of visits, M. would say, "Bye" and "I love you." However, although he sometimes used to cry at the end of visits, he did not anymore. On the contrary, he was happy to leave with his foster mother. M. never said he wanted to go home with mother. She believed that termination of parental rights might affect M., however, because "he does know who I am."

The juvenile court concluded that mother did not meet her burden with respect to the beneficial parent-child relationship exception to the statutory preference for adoption because she did not provide evidence that she occupied a parental role in M.'s life. The court terminated parental rights and referred M. for adoptive placement.

Mother filed a timely notice of appeal.

LEGAL ANALYSIS

1.

MOTHER DID NOT MEET THE BURDEN OF PROOF WITH RESPECT TO THE

BENEFICIAL PARENTAL RELATIONSHIP EXCEPTION

Mother contends that the juvenile court should have found that the beneficial parental relationship exception to the statutory preference for adoption applied, and that the order terminating parental rights must be reversed.

"Adoption must be selected as the permanent plan for an adoptable child and parental rights terminated unless the court finds 'a compelling reason for determining that termination would be detrimental to the child due to one or more of the following circumstances:  [¶]  (i)  The parents have maintained regular visitation and contact with the child and the child would benefit from continuing the relationship. . . .'  (§ 366.26, subd. (c)(1)(B)[(i)].)"  (*In re Bailey J*. (2010) 189 Cal.App.4th 1308, 1314 (*Bailey J*.).)  Under these provisions, "the court must order adoption and its necessary consequence, termination of parental rights, unless one of the specified circumstances provides a *compelling* reason for finding that termination of parental rights would be detrimental to the child.  The specified statutory circumstances . . . 'must be considered in view of the legislative preference for adoption when reunification efforts have failed.'"  (*In re Celine R*. (2003) 31 Cal.4th 45, 53, italics added (*Celine R*.).)  "'Adoption is the Legislature's first choice because it gives the child the best chance at [a full] emotional commitment from a responsible caretaker.'"  (*Ibid*.)

8

The parent has the burden of establishing by a preponderance of the evidence that a statutory exception to adoption applies. (*Bailey J.*, *supra*, 189 Cal.App.4th at p. 1314.) The parent must show both that a beneficial parental relationship exists *and* that severing that relationship would result in great harm to the child. (*Id*. at pp. 1314-1315.) A juvenile court's finding that the beneficial parental relationship exception does not apply is reviewed in part under the substantial evidence standard and in part for abuse of discretion: The factual finding, i.e., whether a beneficial parental relationship exists, is reviewed for substantial evidence, while the court's determination that the relationship does or does not constitute a "compelling reason" (*Celine R.*, *supra*, 31 Cal.4th at p. 53) for finding that termination of parental rights would be detrimental is reviewed for abuse of discretion. (*Bailey J.*, at pp. 1314-1315.)

Mother argues that "compelling" evidence supports the conclusion that a beneficial parental relationship existed. However, since it is the parent who bears the burden of producing evidence of the existence of a beneficial parental relationship, it is not enough that the evidence supported such a finding; the question on appeal is whether the evidence *compels* such a finding as a matter of law. (*Bailey J.*, *supra*, 189 Cal.App.4th at p. 1314; *In re I.W.* (2009) 180 Cal.App.4th 1517, 1528.) As the court in *In re I.W.* discussed, the substantial evidence rule is typically implicated when a defendant contends that the plaintiff succeeded at trial in spite of insufficient evidence. When, however, the trier of fact has expressly or implicitly concluded that the party with the burden of proof did not carry the burden and that party appeals, "it is misleading to characterize the failure-of-proof issue as whether substantial evidence supports the

9

judgment. This follows because such a characterization is conceptually one that allows an attack on (1) the evidence supporting the party who had no burden of proof, and (2) the trier of fact's unassailable conclusion that the party with the burden did not prove one or more elements of the case [citations]. [¶] Thus, where the issue on appeal turns on a failure of proof at trial, the question for a reviewing court becomes whether the evidence compels a finding in favor of the appellant as a matter of law. [Citations.] Specifically, the question becomes whether the [parent's] evidence was (1) 'uncontradicted and unimpeached' and (2) 'of such a character and weight as to leave no room for a judicial determination that it was insufficient to support a finding [in the parent's favor].' [Citation.]" (*In re I.W.*, at p. 1528.) Accordingly, unless the undisputed facts established the existence of a beneficial relationship as a matter of law, a substantial evidence challenge to this component of the juvenile court's determination cannot succeed. (*Bailey J.*, at p. 1314.)

Here, it was undisputed that mother satisfied the visitation prong of the exception because she visited M. consistently, even after reunification was terminated, and the visitation monitor reported that the visits went well. Accordingly, we need not address that prong. As to the beneficial nature of the relationship, however, mother merely recites the holdings of several cases in which a parent was found to have a beneficial relationship with the child. She does not attempt to show how the evidence in this case was similar. Rather, she contends only that the evidence showed the following: (1) Mother "showed a renewed sense of purpose" after termination of reunification services by attending parenting classes, her continued substance abuse treatment and drug

10

testing, and by substantially completing her case plan; (2) mother ended her relationship with father; and (3) M. enjoyed visits with mother, during which mother acted in a parental role by providing food, assisting him with toilet training and disciplining him when necessary. This evidence does not compel the conclusion that mother's relationship with M. was of such benefit to M. that termination of parental rights would be detrimental to him. (*Celine R.*, *supra*, 31 Cal.4th at p. 53.) Accordingly, mother failed to meet her burden under section 366.26, subdivision (c)(1)(B)(i). (*Bailey J.*, *supra*, 189 Cal.App.4th at p. 1314.)

Moreover, even if we assume that a parental relationship exists which is of some benefit to the child, the ultimate question we must decide is whether the juvenile court abused its discretion by failing to find that termination of parental rights would be so detrimental to M. as to overcome the strong legislative preference for adoption. That decision is entrusted to the sound discretion of the juvenile court. (*Bailey J.*, *supra*, 189 Cal.App.4th at pp. 1314-1315.) The court must "determine the *importance* of the relationship in terms of the detrimental impact that its severance can be expected to have on the child and to weigh that against the benefit to the child of adoption." (*Id*. at p. 1315.) We cannot find an abuse of discretion unless the juvenile court exceeded the bounds of reason. (*In re Stephanie M*. (1994) 7 Cal.4th 295, 318-319.) "'"When two or more inferences can reasonably be deduced from the facts, the reviewing court has no authority to substitute its decision for that of the trial court."'" (*Id*. at p. 319.)

Here, the evidence mother cites is simply that she had an established parental bond with M. when he was removed from her custody, and that she had maintained the bond

11

with consistent and positive visitation throughout the dependency. There were no negative events during visits: mother played with M., fed him, assisted with his toilet training and disciplined him appropriately when it was called for. M. called her "momma" and was pleased to see her. A termination order is not subject to reversal merely because there is "'some measure of benefit' in continued contact between parent and child," however. (*In re Jason J.* (2009) 175 Cal.App.4th 922, 937; see *In re C.F.* (2011) 193 Cal.App.4th 549, 557-559.) Rather, there must be evidence that the relationship "promotes the well-being of the child to such a degree as to outweigh the well-being the child would gain in a permanent home with new, adoptive parents" and that severance of the relationship "would deprive the child of a substantial, positive emotional attachment such that the child would be greatly harmed." (*In re Autumn H.* (1994) 27 Cal.App.4th 567, 575.) Here, there simply is no such evidence. M. was removed from his parents' custody at three months of age, and never again spent any time in their home. Even though M. appeared to have some bond with mother and called her "momma," it is not clear that he actually understood that she was his mother. He called his foster mother "mommy" and was always happy to go home with her when a visit ended. He did not cry or ask to go home with mother. Most importantly, there was no evidence whatsoever that M. would suffer great detriment if parental rights were terminated. Consequently, we cannot say it was an abuse of discretion to fail to apply the exception to him.

2.

CONDITIONAL REVERSAL FOR ICWA COMPLIANCE IS REQUIRED

Mother asserts that the juvenile court erroneously found that M. is not an Indian child within the meaning of ICWA because CFS failed to comply with the ICWA inquiry and noticing requirements. She contends that the notices sent to the Indian tribes did not contain available pertinent information, and that the record fails to show that CFS complied with its mandatory duty to investigate and to provide all available information concerning M.'s Indian ancestry.[5] CFS concedes that the notices were incomplete. We agree.

"ICWA protects the interests of Indian children and promotes the stability and security of Indian tribes by establishing minimum standards for, and permitting tribal participation in, dependency actions. [Citations.] If there is reason to believe a child that is the subject of a dependency proceeding is an Indian child, ICWA requires that the child's Indian tribe be notified of the proceeding and its right to intervene. [Citations.]" (*In re A.G.* (2012) 204 Cal.App.4th 1390, 1396.) The court and the social services agency have "reason to know" that a child may be an Indian child if anyone having an interest in the child provides information suggesting that the child is a member of a tribe or eligible for membership in a tribe. (§ 224.3, subd. (b)(1).)

---

[5] Neither parent challenged the sufficiency of the notice in the trial court. This does not, however, forfeit appellate review. (*In re B.R.* (2009) 176 Cal.App.4th 773, 779.) Moreover, although mother is not the parent with possible Indian heritage, she has standing to raise the issue of ICWA compliance. (*Id.* at pp. 779-780.)

"'Notice is a key component of the congressional goal to protect and preserve Indian tribes and Indian families. Notice ensures the tribe will be afforded the opportunity to assert its rights under [ICWA] irrespective of the position of the parents, Indian custodian or state agencies. Specifically, the tribe has the right to obtain jurisdiction over the proceedings by transfer to the tribal court or may intervene in the state court proceedings. Without notice, these important rights granted by [ICWA] would become meaningless.' [Citation.]" (*In re A.G.*, *supra*, 204 Cal.App.4th at p. 1396.) "Accordingly, federal and state law require that the notice sent to the potentially concerned tribes include 'available information about the maternal and paternal grandparents and great-grandparents, including maiden, married and former names or aliases; birthdates; place of birth and death; current and former addresses; tribal enrollment numbers; and other identifying data.' [Citations.] To fulfill its responsibility, the Agency has an affirmative and continuing duty to inquire about, and if possible obtain, this information. [Citations.] Thus, a social worker who knows or has reason to know the child is Indian 'is required to make further inquiry regarding the possible Indian status of the child, and to do so as soon as practicable, by interviewing the parents, Indian custodian, and extended family members to gather the information required in paragraph (5) of subdivision (a) of Section 224.2 . . . .' (§ 224.3, subd. (c).) That information '*shall* include' '[a]ll names known of the Indian child's biological parents, grandparents, and great-grandparents, or Indian custodians, including maiden, married and former names or aliases, as well as their current and former addresses, birthdates,

14

places of birth and death, tribal enrollment numbers, and any other identifying information, if known.' (§ 224.2, subd. (a)(5)(C).)" (*In re A.G.*, at pp. 1396-1397.)

Here, father's ICWA-020 form stated merely that he may have Indian ancestry in an unknown tribe and that the relationship existed through his paternal grandmother, whom he did not identify. However, at the detention hearing on January 9, 2014, father had informed the court, in the presence of the social worker, that the relationship was through his biological father, but that he did not know his biological father's name and would have to ask his mother. He stated his mother's name, date of birth and that she works for the state department in Washington, D.C. Nevertheless, the notices CFS sent out did not contain that information, and there is no indication in the record that CFS contacted father's mother to obtain additional information. Despite the absence of available information in the notices sent by CFS, on April 18, 2014, the court found that notice had been provided in accordance with ICWA and that ICWA does not apply.

Because of their critical importance, ICWA's notice requirements are strictly construed. (*In re A.G.*, *supra*, 204 Cal.App.4th at p. 1397.) If the record reflects that the social services agency failed to inquire of the parent or available relatives to obtain as much information as possible, a reviewing court may reverse the order terminating parental rights and direct the trial court to order the social services agency to comply with its duties of inquiry and notice under ICWA. (*Id*. at pp. 1393-1394, 1397.) Because CFS failed in its duty to inquire into father's Indian ancestry and to provide all available information to the relevant Indian tribes, we will reverse the judgment terminating parental rights and remand the case for further proceedings, as stated below.

15

DISPOSITION

The judgment terminating parental rights is reversed, and the case is remanded to the juvenile court with directions to order the San Bernardino County Children and Family Services to comply with the inquiry and notice requirements of ICWA. If, after proper notice, the juvenile court finds that M. is an Indian child as defined by ICWA, the court shall proceed in conformity with all provisions of ICWA. If, on the other hand, the court finds after proper notice that M. is not an Indian child, the judgment terminating parental rights shall be reinstated.

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

McKINSTER
Acting P. J.

We concur:

MILLER
J.

CODRINGTON
J.

16